UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

NEISHA D.[1],                                    )
                                                 )
            Plaintiff,                           )
                                                 )
    v.                                           )        CIVIL NO. 3:20cv299
                                                 )
ANDREW M. SAUL,                                  )
Commissioner of Social Security,                 )
                                                 )
            Defendant.                           )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social Security Act.  Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12

_____

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

2

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.

2.     The claimant has not engaged in substantial gainful activity since August 8, 2012, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: obesity, degenerative disc disease of the cervical spine, status post surgery, diabetes mellitus with mild diabetic neuropathy, status post carpal tunnel syndrome surgery, asthma, and anxiety (20 CFR 404.1520(c)and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 401.1526, 416.920(d), 416.925 an 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  She can occasionally climb ladders, ropes, or scaffolds. She is limited to frequent balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs.  She is limited to frequent handling and fingering bilaterally.  She must avoid concentrated exposure to respiratory irritants such as fumes, odors, dusts, and gases, and poorly ventilated areas.  The individual should have no interaction with the public and only brief and superficial interaction with coworkers and supervisors.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on May 29, 1970 and was 40 years old, which is defined as a younger individual aged 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 8, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 12-29).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on January 25, 2021. On April 5, 2021 the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on April 23, 2021. Upon full review of the record in this cause, this Court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

On May 16, 2011, Plaintiff reported to neurologist Dr. Jerry Smartt due to tingling and numbness. (R. at 617) Within the past year, the tingling and numbness had worsened. *Id*. Plaintiff had trouble walking distances due to cramps and foot pain. *Id*. Examination revealed decreased vibration sensation and decreased pinprick sensation in the feet. *Id*. Dr. Smartt noted, "Your neuropathy is likely related to diabetes." *Id*. He ordered blood work and an EMG. *Id*. at 618. Dr. Smartt also recommended Plaintiff follow up with a podiatrist. *Id*.

On July 22, 2011, Plaintiff underwent an EMG due to numbness and tingling. (R. at 602) The EMG revealed generalized sensori-motor peripheral polyneuropathy and chronic bilateral median neuropathies at the wrist of moderate degree. *Id*. at 603. Findings were consistent with the diagnoses of diabetic neuropathy and carpal tunnel syndrome. *Id*. In October 2011, Dr. Smartt filled out a medical source statement detailing Plaintiff's physical condition. (R. at 594-597) Dr. Smartt diagnosed Plaintiff with diabetic peripheral neuropathy, bilateral carpal tunnel syndrome, bilateral plantar fasciitis, and left tarsal tunnel syndrome. *Id*. at 594. She suffered moderate to severe pain as well as moderate fatigue. *Id*. In an eight-hour workday, Plaintiff could only stand/walk a maximum of two hours. *Id*. Dr. Smartt opined it was due to Plaintiff's foot pain and balance difficulties. *Id*. at 595. Plaintiff needed a cane to balance herself. *Id*. She could frequently lift and carry up to ten pounds while she could occasionally lift and carry up to twenty pounds. *Id*. Dr. Smartt restricted Plaintiff from wetness, high stress, extreme temperatures, unprotected heights, and climbing ladders, ropes, and scaffolds in the workplace. *Id*. at 596-597. She could

occasionally stoop, kneel, and bend. *Id*. at 596.

On January 24, 2014, Plaintiff presented herself to nurse practitioner Debra Grabner, FNP, due to her diabetes. (R. at 429) She had begun to feel better since looking closer at her diet. *Id*. Examination revealed decreased sensation due to neuropathy and depressed mood. *Id*. at 430. Plaintiff ambulated with a cane. *Id*. On April 23, 2014, Plaintiff again reported to nurse practitioner Debra Grabner, FNP, due to her diabetes. (R. at 425) Examination again revealed decreased sensation due to neuropathy and a depressed mood. *Id*. at 426. Plaintiff still ambulated with a cane. *Id*.

On January 14, 2015, Plaintiff presented herself to family practitioner Dr. Zohair Mapara due to multiple impairments. (R. at 410) Complaints included shortness of breath, heart palpitations, dizziness, leg edema, and fatigue. *Id*. Despite compliance with her medical regimen, Plaintiff still struggled with her diabetes. *Id*. Symptoms included blurred vision, foot numbness, polydipsia, polyuria, polyphagia, and leg pain. *Id*. Examination revealed no monofilament sensation in the right foot. *Id*. at 413. Plaintiff had decreased sensation in the middle to heel of her left foot. *Id*. Dr. Mapara increased Plaintiff's Lantus dosage and decreased her Humalog dosage. *Id*.

On March 19, 2015, Plaintiff presented herself to family practitioner Dr. Zohair Mapara due to low back pain. (R. at 400) Other issues included pain in the arms and legs. *Id*. Examination revealed mild decreased strength and sensation in left upper and lower limb. *Id*. at 402. Tenderness occurred at the lumbar and cervical spine, and epicondyle medial and lateral. *Id*. After examination, Dr. Mapara prescribed Amitriptyline and referred Plaintiff to physical therapy. *Id*. at 403. On April 21, 2015, Plaintiff reported to family practitioner Dr. Zohair Mapara due to left arm

6

tingling and numbness. (R. at 396) The tingling and numbness worsened as time passed. *Id*. Therapy had not helped ease the pain. *Id*. She used a wrist splint. *Id*. Examination revealed mild decreased strength and sensation in left upper and lower limb, as well as triggering of the thumbs. *Id*. at 398. Tenderness occurred at the lumbar and cervical spine, and epicondyle medial and lateral. *Id*. She had positive Tinnel and Phalen's. *Id*. After examination, Dr. Mapara prescribed the following drugs: Chlorzoxazone, Tramadol, and Prednisone. *Id*. at 398-399. He increased Plaintiff's Amitriptyline dosage. *Id*. at 398.

On October 15, 2015, Plaintiff presented herself to endocrinologist Dr. Ann Collie due to her diabetes. (R. at 488) Plaintiff's blood sugar varied immensely during the day. *Id*. She experienced random low blood sugar levels. *Id*. She did not seek medical attention for her low blood sugar levels and treated them by drinking milk or juice. *Id*. Examination revealed diminished vibratory sensation at toe level of the feet and diminished tactile sensation with monofilament testing throughout the feet. *Id*. at 492. Dr. Collie decreased Plaintiff's Lantus and Humalog dosage and prescribed Metformin. *Id*. at 493

On May 13, 2016, Plaintiff underwent an MRI of her cervical spine. (R. at 703) The MRI revealed multilevel degenerative changes of the cervical spine, central narrowing with moderate narrowing with cord flattening, disc protrusion with moderate central narrowing and moderate foraminal narrowing. *Id*. at 704. The same day Plaintiff had an MRI of her lumbar spine. *Id*. at 706. The MRI revealed "degenerative changes, most prominently L5-S1 where there is a disc protrusion, touching both S1 nerve roots and facet touching the exiting L5 nerve roots in the foramen." *Id*. at 707.

On June 29, 2016, Plaintiff underwent an anterior C4-C5 discectomy and fusion with

7

Trinnect allograft and Atlantis Elite plate. (R. at 514) She underwent this procedure due to cervical spine disk protrusion. *Id*.

On July 27, 2016, Plaintiff reported to St. Vincent Physical and Sports Therapy for physical therapy due to low back and neck pain. (R. at 542) She was discharged on November 18, 2016 due to an upcoming carpal tunnel procedure. *Id*. Between July 27, 2016 and November 18, 2016, Plaintiff attended twelve appointments. *Id*.

On August 2, 2016, neurologist Dr. Loi Phuong wrote to Plaintiff's family practitioner, Dr. Zohair Mapara, about Plaintiff's condition. (R. at 1004) Despite improvement after a discectomy and fusion, Plaintiff still had residual pain in her left arm and some neck discomfort. *Id*. He referred Plaintiff to physical therapy and restricted her from lifting fifteen pounds or more. *Id*.

On September 14, 2016, Plaintiff returned to endocrinologist Dr. Ann Collie due to her diabetes. (R. at 894) Blood sugar levels recorded by Plaintiff's insulin pump leveled more than 130 eighty-three percent of the time. *Id*. at 895. When Plaintiff had bouts of low blood sugar, she did not seek medical attention and simply drank juice or milk. *Id*. Examination revealed diminished vibratory sensation at the level of the toes on both feet, as well as diminished tactile sensation with monofilament testing throughout the feet. *Id*. at 900.

On September 20, 2016, Plaintiff presented to orthopedic surgeon Dr. Charles Kershner due to a recent mass on her left foot. (R. at 772) The mass had begun a month prior, but the night before the current appointment, the mass had disappeared. *Id*. Generally, Plaintiff had pain in her left foot. *Id*. Her left arch was not as good as the arch on her right foot. *Id*. Pain occurred at the lateral sinus tarsi. *Id*. Examination revealed flatfoot gait on the left foot, weakness of the left posterior tibia tendon, lateral sinus tarsi tenderness, valgus deformity of the foot and ankle upon

8

standing, as well as small residual swelling where the recent mass had been located. *Id*. at 774. Dr. Kershner recommended a sturdy, lace up oxford shoe with a longitudinal arch support and 1.8 inches medial heel wedge on the left side to relieve her lateral sinus tarsi syndrome. *Id* The lateral sinus tarsi syndrome stemmed from either a tarsal coalition, congenital weakness, or absence of the posterior tibia tendon. *Id*. If symptoms did not improve, Dr. Kershner would discuss a subtalar fusion. *Id*.

On September 21, 2016, Plaintiff returned to family practitioner Dr. Zohair Mapara due to her carpal tunnel syndrome and depression. (R. at 755) Plaintiff's EMG revealed moderate carpal tunnel syndrome, and in the past, she had injections done but with limited benefit. *Id*. She wore wrist splints at night and sometimes during the day. *Id*. Despite taking Amitriptyline regularly, Plaintiff saw no improvement. *Id*. When asked about her depression, Plaintiff reported her depression symptoms were not well controlled. *Id*. Examination revealed bilateral grip weakness. *Id*. Throughout the appointment, Plaintiff had a tearful mood and affect. *Id*. Dr. Mapara increased Plaintiff's Amitriptyline dosage and referred her to an orthopedic surgeon. *Id*. at 756. He also advised her to follow up with Peace of Mind. *Id*.

On October 5, 2016, Plaintiff reported to orthopedic surgeon Dr. Charles Kershner due to hand pain. (R. at 663) Numbness accompanied the pain. *Id*. The pain and numbness occurred in both hands. *Id*. Plaintiff's recent neck surgery had no bearing on her hand pain. *Id*. A nerve conduction study done in 2016 revealed bilateral moderate lateral tunnel syndrome. *Id*. Examination revealed diminished sensation over the median nerve distribution bilaterally and bilateral weakness of the opponent muscles with atrophy. *Id*. at 665. Plaintiff had a positive Phalen's test. *Id*. Dr. Kershner diagnosed Plaintiff with bilateral carpal tunnel syndrome. *Id*. He

planned a right carpal tunnel release. *Id*. The left carpal tunnel release would be done later. *Id*.

On October 11, 2016, Plaintiff presented to family practitioner Dr. Stephen Kennedy for a physical consultative examination as mandated by the Social Security Administration. (R. at 644-648) Plaintiff reported difficulties with decreased neck mobility, as well as stiffness and pain in her lumbar spine. *Id*. She had problems bending, stooping, twisting, and lifting any weight. *Id*. In the past, she had worked as a CNA but could not continue to work as a CNA due to lumbar spine spasms after prolonged sitting or standing. *Id*. She attempted an office job, but the spasms also prevented her from working properly. *Id*. The disabilities were beginning to affect her daily living as she had trouble washing dishes and vacuuming. *Id*. During the examination, Dr. Kennedy noted Plaintiff heavily favored her right leg when ambulating, limping with her left leg. *Id*. at 645. When pivoting, she needed support to prevent her from falling. *Id*. Plaintiff could not perform tandem, heel, or toe walk due to ataxia. *Id*. at 645. She had a positive Romberg, Tinel, and Phalen. *Id*. at 646. Plaintiff had limited range of motion in the spine, shoulders, wrists, hips, and ankles. *Id*. at 648. Examination revealed degenerative changes of the bilateral knees with widening of joints, decreased sense of touch in the right median nerve distribution and peripheral toes in a sock-like distribution. *Id*. at 646. Dr. Kennedy opined Plaintiff could not, or would have major difficulty in, climbing stairs, lifting, carrying, walking, or standing for any given period in her present state. *Id*. at 647.

On October 20, 2016, Plaintiff underwent a right carpal tunnel release. (R. at 667) On January 10, 2017, Plaintiff reported to family practitioner Dr. Zohair Mapara due to her carpal tunnel release surgeries and back pain. (R. at 827) Plaintiff had run out of Amitriptyline but admitted she did not notice a difference between when she took it and when she did not. *Id*.

Plaintiff's carpal tunnel syndrome symptoms had improved somewhat since the release surgeries. *Id*. Examination revealed lumbar spine tenderness and mild paraspinal muscle spasms. *Id*. He discontinued Plaintiff's Amitriptyline prescription and referred her to pain management. *Id*. at 828.

On February 21, 2017, Plaintiff reported to nurse practitioner Lisa Stults, NP, due to back and neck pain. (R. at 1080) Pain had worsened over time, and it was not well controlled with rest, activity modification or medication. *Id*. Plaintiff reported she had a bulging disc in her lower back, but she had not had surgery for it yet due to her neck fusion still healing. *Id*. The pain was constant with intermittent flare-ups. *Id*. Plaintiff had a guarded, antalgic gait and station. *Id*. at 1082. Examination revealed pain with palpation to lumbar facet joints, hyperextension, bilateral facet loading maneuver by lateral flexion/bending, bilateral lateral rotation, and a positive left straight leg raise. *Id*. Ms. Stults prescribed Tramadol, advised Plaintiff to continue to use her TENS unit, referred Plaintiff to physical therapy, and scheduled Plaintiff for a lumbar medial branch block. *Id*. at 1086. On March 22, 2017, Plaintiff received a lumbar medial branch block. (R. at 1075) On April 22, 2017, Plaintiff received another lumbar medial branch block. (R. at 1072-1073)

On May 10, 2017, Plaintiff reported to Dukes Memorial Hospital Emergency Room due to pain. (R. at 974) The pain occurred on the left-side of her chest wall and back. *Id*. It began the previous day. *Id*. Movement of any kind exacerbated the pain. *Id*. Examination revealed mild to moderate thoracic paravertebral spasm on the left side of the upper back, as well as sensitivity in the thoracic spine region which caused moderate point tenderness. *Id*. at 975. A lumbar spine x-ray revealed mild degenerative disc disease. *Id*. at 982. A thoracic spine x-ray revealed mild spondylosis. *Id*. at 983. The emergency room diagnosed her with thoracic radiculopathy and

11

lumbar degenerative disc disease. *Id*. at 975. They treated her with Naproxen. *Id*. On May 19,

2017, Plaintiff received a lumbar medial branch nerve neurotomy. (R. at 1069-1070) On June 21,

2017, Plaintiff received another lumbar medical branch nerve neurotomy. (R. at 1066-1067)

On July 18, 2017, Plaintiff presented herself to pain management physician Dr. Shahbaz

Qavi due to back and neck pain. (R. at 1058) The pain was somewhat manageable with

medications and activity modifications. *Id*. Plaintiff had received a right radiofrequency ablation

with only twenty to twenty-five percent relief, which only lasted for approximately a week. *Id*.

Trigger point injections did not help her. *Id*. Tylenol "knocked her out" while Norco had some

benefit. *Id*. The pain occurred constantly with intermittent flareups. *Id*. It radiated down to her left

leg. *Id*. Plaintiff had an antalgic, guarded gait and station. *Id*. at 1059. Examination revealed lower

back pain upon palpation of lumbar facet joints, hyperextension, bilateral lateral flexion/bending,

and bilateral lateral rotation. *Id*. Her straight leg raise test was positive. *Id*. After examination, Dr.

Qavi discontinued Plaintiff's Tramadol and prescribed a trial of Norco and Mobic. *Id*. at 1061. He

scheduled Plaintiff for a lumbar epidural steroid injection and considered prescribing Gabapentin in

the future. *Id*.

On September 12, 2017, Plaintiff returned to pain management physician Dr. Shahbaz Qavi

due to back and neck pain. (R. at 1046) Plaintiff had an antalgic gait and station. *Id*. at 1047.

Examination revealed tenderness to palpation at the lumbar paraspinal muscles, as well as pain on

flexion and extension of back. *Id*. at 1047-1048. Dr. Qavi ordered a lumbar sympathetic block. *Id*.

at 1048.

On October 3, 2017, Plaintiff presented herself to endocrinologist Dr. Ann Collie due to

her diabetes. (R. at 1181) Since the last appointment, Plaintiff's blood sugars were high at least

12

sixty-three percent of the time. *Id*. at 1182. She did have bouts of hyperglycemia at night but was able to treat them at home without EMS intervention. *Id*. Examination revealed diminished vibratory sensation in both feet at the toe levels. *Id*. at 1187. Dr. Collie prescribed Victoza. *Id*. at 1188. On December 27, 2017, Plaintiff returned to physician assistant Haley Innocenti, PA-C, due to low back and leg pain. (R. at 1031) The pain was constant with intermittent flareups. *Id*. It radiated down her left leg to the foot. *Id*. Plaintiff had an antalgic gait and station. *Id*. at 1032. Ms. Innocenti advised Plaintiff to continue her current medication regimen. *Id*. at 1034. On February 2, 2018, Plaintiff presented to physician assistant Haley Innocenti, PA-C, due to back pain. (R. at 1021) The pain was somewhat manageable with medications and activity modifications. *Id*. It radiated to her legs. *Id*. Plaintiff had an antalgic gait and station. *Id*. at 1022.

On March 21, 2018, Plaintiff returned to physician assistant Haley Innocenti, PA-C, due to back and neck pain. (R. at 1010) The pain had somewhat improved with medications and activity modification. *Id*. The pain occurred constantly with intermittent flareups. *Id*. It radiated to her left lower extremity. *Id*. Plaintiff had an antalgic gait and station. *Id*. After examination, Ms. Innocenti began to consider a SCS trial as Plaintiff's medication and therapies had not helped her pain levels. *Id*. at 1013.

On November 19, 2018, Plaintiff appeared for a teleconference hearing in Indianapolis, IN before ALJ William Spalo of the Oak Brook, IL Office of Disability Adjudication and Review (ODAR). (R. at 229-234) Plaintiff's attorney and a vocational expert also attended the hearing. *Id*. at 41.

Plaintiff testified she was not able to work anymore due to recent neck surgery, pinched nerves, neuropathy, diabetes, COPD, and mental disorders. (R. at 55-61, 76) Plaintiff received a

TENS unit and was referred to physical therapy. *Id*. at 56. She used her TENS unit four or five times a day for fifteen to twenty minutes at a time. *Id*. Plaintiff also attended physical therapy for her pinched nerves. She also received injections. *Id*. at 57. However, both treatments failed to help control her pain. *Id*.

The neuropathy Plaintiff suffered stemmed from her diabetes. (R. at 58-59) It occurred in both her hands and feet. *Id*. at 58. At times, she dropped things such as the previous Saturday she dropped her grandson's cup. *Id*. at 59. Picking up things also proved to be difficult. Plaintiff explained, "I have to bring things to the edge of the table to pick it up." *Id*. Symptoms associated with neuropathy included numbness and burning. *Id*. at 60. The numbness in her feet caused disequilibrium. *Id*. Sometimes she had to rely on her daughter for warning if her feet were getting close to a heater because she could not feel the heat. *Id*. Her daughter helped with the laundry by putting the wet clothes into the dryer. *Id*. at 66. Plaintiff would then sit on the edge of the bed to fold the laundry. *Id*.

The hearing continued with the questioning of the vocational expert . (R. at 77) Plaintiff's past relevant work comprised of home health aide, office clerk, chicken laborer, security guard, and cashier. *Id*. at 79.The ALJ began to pose hypothetical vocational scenarios surrounding an individual with the same education, age, and work-experience as Plaintiff. *Id*. The first scenario set the exertion level at light work. *Id*. The ALJ included the parameters: frequent climbing ramps or stairs, frequent balancing, stooping, crouching, kneeling, and crawling. *Id*. Security guard, general office clerk, and cashier could still be performed within the scenario. *Id*. Other positions included sorter, assembler, and packer. *Id*. at 80.

The second hypothetical scenario built upon the first scenario and added the following

parameters: frequent handling, fingering bilaterally, avoid concentrated exposure to respiratory irritants, such as fumes, odors, dusts, and gases, along with poorly ventilated areas; no interaction with the public in the work setting and only brief, superficial interaction with co-workers and supervisors. (R. at 80) This scenario would eliminate Plaintiff's past relevant work. However, the positions of sorter, assembler, and packer would still be available. *Id*.

The third hypothetical scenario built upon the first two scenarios and changed the exertion level to sedentary. (R. at 80) The ALJ added the following parameters: frequent handling and fingering bilaterally. *Id*. The positions of sorter, assembler, and packer would still be available. *Id*. at 81. At the sedentary level, there would be frequent utilization of the bilateral upper extremities. *Id*. Plaintiff's attorney cited a consultative examination which stated Plaintiff could only occasionally handle and finger bilaterally. *Id*. The VE replied:

> All sedentary work would be eroded. And at the light level of physical tolerance, I would erode the manufacturing jobs that I presented. And if I were to include that the hypothetical individual could only have occasional contact with co-workers and/or with supervisors, as well as the general public, it would rule out all substantial, gainful activity at the light level….

*Id*. at 82.  An off-task rate of more than fifteen percent would result in termination from a job. *Id*. An employee could miss one and a half days of work per month equivalent to eighteen days in a year. *Id*. at 83. If an employee misses more than a month's work (more than 20-23 workdays) in a year, employment will most likely be terminated. *Id*

The hearing concluded with a closing statement from Plaintiff's attorney. (R. at 83) He argued Plaintiff suffered from the severe impairment of degenerative disc disease of the lumbar and cervical spine. *Id*. Accompanying the severe impairment were disc protrusion and nerve root impingement *Id*. Plaintiff's diabetes, carpal tunnel syndrome and peripheral neuropathy also further

15

agitated Plaintiff's physical condition. *Id*. at 83-84. Surgeries to both her back and hands only

provided some benefit and did not eliminate her problems. *Id*. at 83-84. Plaintiff's attorney opined

that Plaintiff's mental health conditions (depression, anxiety, and PTSD) required weekly

treatment, and a source statement from Plaintiff's psychiatric provider still showed moderately

severe to severe impairment. *Id*. at 84. Plaintiff's attorney concluded:

> …It would reduce her to unskilled work…an [interactional] level that's no more
> than occasional basis, with others, and none with the general public. And I think it
> would also show that she would be off task for at least fifteen percent of the
> workday. And as the vocational expert testified, these are all work restrictions that,
> when combined with her physical condition, would preclude all work. So, I don't
> think it's just one or other physical or mental, but I think when you combine all of
> her impairments, that that would preclude all work.

*Id*. at 84-85.

In support of remand, Plaintiff first argues that the ALJ erred at Step Three. At Step

Three, an ALJ is required to determine whether the claimant meets or equals any of the listed

impairments found in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1.

*Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); 20 C.F.R. § 404.1520(a)(4)(iii). For each

listed impairment, there are objective medical findings and other specific requirements which must

be met to satisfy the criteria of that Listing. 20 C.F.R. §§ 404.1525(c)(2)-(3), 416.925(c)(2)-(3).

When a claimant satisfies all such criteria, that person is deemed presumptively disabled and

entitled to benefits. *Barnett*, 381 F.3d at 668; 20 C.F.R. §§ 404.1525(a), 416.925(a),

404.1525(c)(3) and 416.925(c)(3). Even if a claimant's listed impairment does not satisfy each

requirement of the specified elements of the listing, it can result in a finding of disability if the

record contains "other findings related to [the] impairment that are at least of equal medical

significance to the required criteria" or if "the findings related to [a combination of] impairments

16

are at least of equal medical significance to those of a listed impairment." 20 C.F.R. §§ 404.1526, 416.926. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett*, 381 F.3d at 668. The Seventh Circuit has held that "the ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).

Plaintiff argues that the ALJ did not mention Listing 1.04(a) by name or provide any meaningful evaluation of its criteria, despite the fact that Plaintiff exhibited each requirement necessary to meet the listing several times over. (R. at 13) In the Decision, the ALJ stated, "The record shows that she is able to use her right and left upper extremities effectively and is able to ambulate effectively. There is no evidence of a disorder of the spine resulting in compromise of a nerve root with evidence of nerve root compression, spinal arachnoiditis, confirmed by operative note or pathology reports, or lumbar spinal stenosis resulting in pseudoclaudication" *Id*. Plaintiff argues that this statement does not enable the Court to engage in meaningful review as it does not specifically address Listing 1.04(a), which Plaintiff claims she demonstrated each of the criteria required to meet the Listing. Plaintiff further argues that whether or not the record is devoid of "spinal arachnoiditis", an inability to "ambulate effectively," or "lumbar stenosis resulting in pseudoclaudication" is not relevant to a claimant's meeting or medically equaling Listing 1.04(a) as those criteria are relevant only to Listings 1.04(b) and 1.04(c). Listing 1.04(a) merely requires a disorder of the spine resulting in

compromise of a nerve root or the spinal cord. With: evidence of nerve root

> compression characterized by neuro-anatomic distribution of pain, limitation of
> motion of the spine, motor loss (atrophy with associated muscle weakness or
> muscle weakness) accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight leg raise test.

*Id*. Plaintiff claims she exhibited each of the aforementioned criteria. Plaintiff contends that the

medical imaging demonstrated the threshold findings of nerve root or cord compromise at multiple

levels of the lumbar and cervical spine. Plaintiff points out that the medical records indicate

Plaintiff's cervical spine MRI showed "central narrowing C4-C7" with "flattened cord" and disc

protrusions at C4-C5 which "could be affecting the C5 nerve roots." (R. at 704) Further, an MRI

of the lumbar spine demonstrated a disc protrusion at L5-S1 "touching both S1 nerve roots and

disc and facet touching the exiting L5 nerve roots." (R. at 707)

Plaintiff further argues that the record also demonstrates her multiple exhibitions of each of

the clinical examination criteria required to meet Listing 1.04(a): neuroanatomic distribution of

pain evidenced by radiating pain and diagnoses of thoracic radiculopathy; (R. at 400, 410, 1004,

1010, 1022, 1031, 1032, 1058, ); limited range of motion of the spine, shoulders, wrists, hips, and

ankles (R. at 648,); motor loss via demonstration of upper and lower extremity weakness with

documentation of atrophy and guarded, antalgic and ataxic gait with positive Romberg Sign

indicating extreme difficulty with balance (R. at 398, 402, 645, 646, 665, 755, 774, 1010, 1022,

1032, 1047, 1059, 1082); sensation loss of the upper and lower extremities as evidenced by

monofilament testing and positive Phalen's and Tinel's sign (R. at 398, 402, 413, 426, 430, 492,

617, 646, 665, 900, 1187), and positive straight leg raise tests (R. at 1059, 1082).

In response, the Commissioner argues that "Plaintiff failed to establish a specific

neuro-anatomic distribution of pain arising from nerve root compression." (Def's Br. at 5)

However, the Commissioner does not dispute that Plaintiff has provided multiple MRIs demonstrating spinal cord flattening and nerve root compromise combined with her complaints of widespread radiating pain to demonstrate that the former caused the latter.

The Commissioner also agues that Plaintiff has not met the 12-month duration requirement. 20 C.F.R.§§ 404.1525(c)(4)[2] and 416.925(c)(4)[3]. These regulations require that the impairment causing disability last, or be expected to last, for a period of 12 continuous months. However, Listing 1.04(a) prescribes no frequency or period of time for which a claimant must exhibit any of its criteria to meet or equal the listing. Plaintiff contends that a plain reading of Listing 1.04(a) indicates that, so long as the individual maintains the threshold etiology of spinal cord or nerve root compromise, a single instance of each of the correlating examination criteria demonstrates a meeting of the listing. The Commissioner suggests no alternative amount of times a claimant must exhibit a diminished range of motion of the spine in order to satisfy that element of the listing.

The Commissioner also contends that Plaintiff's exhibition of abnormal and deficient gait did not support a conclusion she demonstrated motor loss. However, the record clearly shows that atrophy and bilateral upper extremity muscle weakness were observed on examination (R. at 665). Upper and lower extremity weakness was likewise explicitly noted on examination (R. at 398, 402, 646).

---

[2] This regulation states:
Most of the listed impairments are permanent or expected to result in death.  For some listings, we state a specific period of time for which your impairment(s) will meet the listing.  For all others, the evidence must show that your impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months.

[3] Same.

The Commissioner argues that Plaintiff did not exhibit sensory deficiency for purposes of meeting or equaling Listing 1.04(a). The Commissioner contends that, because some of the sensation loss was observed upon "diabetic foot exam" and at an appointment where carpal tunnel was diagnosed, the sensation loss could not relate to Plaintiff's compressed cervical spinal cord and the compromised nerve roots within her lumbar spine. (R. at 704, 707). However, as Plaintiff notes, there were examinations in which Plaintiff demonstrated sensation loss unrelated to either diabetic examinations or carpal tunnel. Plaintiff exhibited decreased sensation of upper and lower limb and the diagnosis was "cervical radiculopathy due to degenerative joint disease of spine." (R. 402). While the record documents "carpal tunnel in both hands since 2000" it also noted "degenerative spinal stenosis" and "C4-C5 fusion in 2016" after observing sensation loss of the bilateral arms.  (R. 646-47).

The Commissioner also attempts to make a distinction between straight leg raises in the sitting or supine position. Plaintiff's examiners did not differentiate between straight leg raise testing in the sitting or supine positions. They broadly concluded that "straight leg raise" tests were positive bilaterally in one instance and "on the right" in another, creating a possibility that Plaintiff's test was positive in only one of the sitting or supine positions, or both. The ALJ could have attempted to determine whether Plaintiff exhibited straight let raising in both the sitting and supine positions. He could have, as the Seventh Circuit has required, attempted to clarify with Plaintiff's examining physicians. *See Barnett v. Barnhart*, 381 F.3d 664, 669-670 (7th Cir. 2004) (finding the ALJ should have contacted claimant's doctor for clarification of her medical opinions, and asking for more detail). The ALJ's failure represents a deficient logical and accurate bridge from the evidence to his conclusion Plaintiff did not meet or medically equal Listing 1.04(a).

*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir, 2009); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). Clearly, remand is required on the issues raised by Plaintiff regarding whether she meets or equals Listing 104(a). All of the pertinent medical evidence needs to be carefully considered by the ALJ. Also, a finding must be made resolving the issue of the 12-month duration requirement. Additionally, the issues of Plaintiff's straight leg raise tests must be addressed and resolved.

Further, the Commissioner does not contest Plaintiff's contention that the ALJ erred in relying on state agency physicians who gave no indication they ever reviewed the MRIs most pertinent to Plaintiff potentially meeting or equaling Listing 1.04(a). Their review of the evidence made no mention of Plaintiff's exhibiting, on MRI, threshold etiology of Listing 1.04(a): compromised nerve roots and cord compression. Thus remand on this point is also warranted so a medical expert with knowledge of Plaintiff's MRIs can consider whether Listing 1.04(a) was met or medically equaled.

Next, Plaintiff argues that the ALJ failed to offer a sufficient explanation for his conclusion that Plaintiff's sensori-motor peripheral polyneuropathy of the lower extremities and bilateral median neuropathy of the wrists did not meet or medically equal Listing 11.14(a). The record shows that Plaintiff was diagnosed with lower extremity polyneuropathy and median neuropathy of the upper extremities via EMG. She required the use of an assistive device for ambulation and had marked difficulties with her gait. (R. at 603) Listing 11.14(a) requires "peripheral neuropathy characterized by disorganization of motor function in two extremities (*see* 11.00D1), resulting in an extreme limitation (*see* 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities." The ALJ stated "Section 11.14 has also been

contemplated. This refers to peripheral neuropathies with disorganization of motor function as described in 11.04(b), in spite of prescribed treatment. This level of limitation is not demonstrated in the record." (R. at 13) Plaintiff strongly contends that because the record clearly shows that she suffers from disorganization of motor function in her bilateral upper and lower extremities, as well as severe limitation in her ability to maintain balance while ambulating, the ALJ's conclusory analysis does not provide this Court with a logical and accurate bridge from such a conclusion to the actual evidence, and that this deficiency precludes this Court from engaging in meaningful review.

Plaintiff points out that the record is replete with objective clinical findings suggestive of bilateral "disorganization of motor function": EMG results demonstrated abnormal neuropathic findings bilaterally (R. at 603); doctors observed atrophy of the upper extremities (R. at 665), decreased strength of the upper and lower extremities and antalgic, guarded, ataxic gait (R. at 398, 402, 645, 646, 665, 755, 774, 1010, 1022, 1032, 1047, 1059, 1082); and diminished sensation of the upper and lower extremities (R. at 398, 402, 413, 426, 430, 492, 617, 646, 665, 900, 1187). Moreover, the record further includes observations which could reasonably be found representative of "extreme" limitation to Plaintiff's ability to maintain her balance while standing and/or walking: positive Romberg sign (R. at 646); as well as guarded, antalgic and ataxic gait as mentioned above. The Agency consultative examiners observed "the patient heavily favors the right leg. Limps with left leg. Must support herself while pivoting to keep from falling. Cannot perform tandem walk, heel walk or toe walk due to ataxia. Positive Romberg is noted. The patient must be held to keep from falling." (R. at 645-646). After observing this, he opined "She would have impossibility or much difficulty with climbing stairs, lifting, carrying, walking or standing for

22

any given period of time in her present state." (R. at 647)

Thus Plaintiff argues that the fact she exhibited an abnormal gait with positive clinical signs and the Agency's own examining physician observed she "must be held to keep from falling" seems highly supportive of the notion that her combined impairments could reasonably be deemed to result in "extreme limitation" to her ability to maintain balance while standing and/or walking. Plaintiff further argues that the record contains a multitude of objective showing that she meets or medical equals Listing 11.14(a). Plaintiff concludes that the ALJ's failure to explain why the aforementioned evidence did not support a meeting or medical equaling of Listing 11.14(a) requires remand.

In response, the Commissioner attempts, post hoc, to evaluate whether Plaintiff met or medically equaled Listing 11.14(a). This is a violation of *Chenery*. *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S. Ct. 1575 (1947). The Commissioner acknowledges Plaintiff's "marked" deficiencies with her gait even while using a cane (R. at 603) as well as her demonstration of ataxia, antalgic gait, and guarded gait. (R. at 398, 402, 645, 646, 665, 755, 774, 1010, 1022, 1032, 1047, 1059, 1082)). Yet the Commissioner contends that this could not have reasonably evidenced an "extreme" limitation to Plaintiff's ability to maintain her balance while walking. The Commissioner does not acknowledge Plaintiff's positive Romberg test, a test which specifically measures a patient's ability to balance. (R. at 646) Likewise, the Commissioner failed to consider the Agency's examining physician's conclusion "The patient must be held to keep from falling." (R. at 645-646).  This Court agrees with Plaintiff that any discussion of whether Plaintiff had an "extreme" limitation to maintain her balance which omits the aforementioned evidence is not a "more-than-perfunctory" discussion of the listing. The ALJ failed to provide a logical and accurate

23

bridge from the evidence to his conclusion that Plaintiff did not meet or medically equal listing 11.14(a). Thus, remand is required so the ALJ may actually consider the evidence most pertinent to whether Plaintiff met or medically equaled Listing 11.14(a).

Next, Plaintiff argues that the ALJ failed to provide a good explanation for dismissing the opinion of an Agency consultative examiner. The Social Security Administration provides that its "[a]djudicators must weigh medical source statements under the rules set out in 20 C.F.R. §§ 404.1527 and 416.927," and "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." S.S.R. 96-8p. The Agency's regulations require an ALJ to weigh opinion evidence, "[r]egardless of its source," with consideration of several factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability ("we will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim"), consistency, and specialization. 20 C.F.R. §§ 404.1527 (c), 416.927 (c). It is well-settled that to enable meaningful review an ALJ must build a logical and accurate bridge between evidence and conclusions. *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

The Seventh Circuit applies additional scrutiny when an ALJ rejects the disabling opinion of his own agency's examining physician, "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled can be expected to cause a reviewing court to take notice and await a good explanation here for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). In the present case, Dr. Stephen Kennedy opined, after examining

Plaintiff, that she "would have impossibility or much difficulty with climbing stairs, lifting, carrying, walking or standing for any given period of time in her present state." (R. at 647) The ALJ rejected this opinion, holding that "the statement is not consistent with the Social Security Administration's criteria for evaluating disability, as the doctor did not provide specific functional limitations" and "while the doctor's statement may be somewhat consistent with the claimant's presentation at this evaluation, it is not supported by the overall objective medical record, including improvement shown after carpal tunnel release surgeries." (R. at 27)

Plaintiff contends that Dr. Kennedy's assessment of an inability to climb stairs, lift any weight, carry any weight, stand, or walk for any "given period of time" is an assessment, from a physician contracted by the Social Security Administration, that Plaintiff could not perform the physical demands of even "sedentary" exertion work as defined by the agency. Plaintiff notes that the finding that she could not lift or carry any weight, or stand or walk for any prolonged period is obviously inconsistent with the ALJ's conclusion that she could lift and carry up to ten pounds for up to 1/3 of an eight-hour workday or stand and walk for up to 1/3 of an eight-hour workday. Plaintiff argues that the ALJ's conclusion that the opinion was not "consistent with the Social Security Administration's criteria for evaluating disability" is simply inaccurate as it was a very clear opinion that Plaintiff could not consistently perform the exertional requirements of even sedentary work and was, therefore, disabled as a result. (R. at 27) Plaintiff further points out that if the ALJ truly believed the ambiguity or lack of agency-specific language was too great to assign positive weight to the disabling opinion of his own agency's examining physician, he certainly could have attempted to contact Dr. Kennedy and clarify. *Barnett v. Barnhart*, 381 F.3d 664, 669-670 (7th Cir. 2004) (finding the ALJ should have contacted claimant's doctor for clarification

25

of her medical opinions, and asking for more detail).

Plaintiff further argues that while her carpal tunnel release surgery may have improved her ability to engage in fine manipulation, it does not explain how a surgery addressing her upper extremities undermines Dr. Kennedy's opinion with regard to standing, walking and carrying. It cannot be disputed that Dr. Kennedy observed that, while Plaintiff attempted to ambulate during the examination, she "must be held to keep from falling." (R. at 645-646) This observation is not only consistent with Dr. Kennedy's assessment of her inability to stand and/or walk for any prolonged period, let alone 1/3 of an eight-hour workday, but it is also wholly consistent with the evidence contained in the broader record demonstrating diminished lower extremity strength and loss of sensation as well as guarded, antalgic and ataxic gait

In response, the Commissioner relies on the non-examining state agency physicians' opinions. However, the Seventh Circuit has held that "an ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). In the present case, the state agency non-examining physicians were seemingly unaware of, and made no mention of, Plaintiff's most significant medical imaging: MRIs which demonstrated listing level etiology. (R. at 704, 707) In contrast, Dr. Kennedy examined Plaintiff. He observed she "must be held to keep from falling" when ambulating. (R. at 645-646).

As discussed, the ALJ did not mention the multitude of clinical findings, diminished strength, atrophy, diminished sensation, markedly abnormal gait with an assistive device, which each support Dr. Kennedy's opinion. The Commissioner, likewise, does not contest these omissions. Accordingly, remand is required for an appropriate consideration of Dr. Kennedy's

consultative opinion.

Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED

AND REMANDED for further proceedings consistent with this Opinion.


 Entered: April 30, 2021.


                                                    s/ William C.  Lee
                                                    William C. Lee, Judge
                                                    United States District Court